

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

Rod J. Rosenstein
United States Attorney

Solette A. Magnelli
Assistant United States Attorney

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-344-4124*
*MAIN: 301-344-4433*
*FAX: 301-344-4516*
*TTY/TDD: 301-344-2426*
*Solette.Magnelli@usdoj.gov*

March 22, 2010

Malik Edwards
Office of the Federal Public Defender
100 South Charles Street, Tower II, Suite 1100
Baltimore, Maryland 21201

_____FILED   _____ENTERED
_____LODGED   _____RECEIVED

APR - 1 2010

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

  Re: United States v. Craig Allen Corey, II, JFM-09-0512

Mr. Edwards:

    This letter, together with the Sealed Supplement, confirms the plea agreement that has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by April 1, 2010, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

    1. The Defendant agrees to plead guilty to the following charges in the Superseding Indictment now pending against him, which charges him with Conspiracy Related to Interstate Prostitution, in violation of 18 U.S.C. § 371 (Count One); Interstate Transportation for Prostitution (Mann Act), in violation of 18 U.S.C. § 2421 (Count Two); Enticement, in violation of 18 U.S.C. § 2422(a)(Count Three); Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. § 1591(Counts Four and Five); Sex Trafficking of a Minor (Count Six); Conspiracy to Distribute and Possess with Intent to Controlled Dangerous Substances (Count Eight), in violation of 21 U.S.C. § 846; Distribution of BZP (Count Nine), in violation of 21 U.S.C. § 841. The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

<u>Elements of the Offense</u>

    2. The elements of the offenses to which the Defendant has agreed to plead

1

guilty, and which this Office would prove if the case went to trial, are as follows:

### Count One: Conspiracy Related to Interstate Prostitution

       a.      That a conspiracy between two or more persons to transport any individual with intent that such individuals engage in prostitution as charged in the Indictment existed,

       b.      That a conspiracy between two or more persons to persuade, induce, entice and coerce any individual to travel in interstate commerce to engage in prostitution as charged in the Indictment existed,

       c.      That the defendant knowingly and intentionally became a member of that conspiracy, and

       d.      That one or more of co-conspirators did any act to effect the object of the conspiracy.

### Count Two: Interstate Transportation for Prostitution

       a.      The defendant did knowingly and intentionally,

       b.      Transport individuals in interstate and foreign commerce,

       c.      With the intent that such individuals engage in prostitution.

### Count Three: Enticement

       a.      The defendant did knowingly,

       b.      Persuade, induce, entice and coerce an individual,

       c.      To travel in interstate and foreign commerce to engage in prostitution.

### Counts Four and Five: Sex Trafficking by Force, Fraud and Coercion

       a.      The defendant knowingly,

       b.      In and affecting interstate and foreign commerce,

       c.      Recruited, enticed, harbored, transported, provided and obtained by any means an individual,

       d.      Benefitted financially and received anything of value from participation in a venture engaged in such acts, and

       e.      Knowing or in reckless disregard of the fact that force, fraud and coercion would be used to cause said individual to engage in a commercial sex act.

### Count Six: Sex Trafficking of a Minor

       a.      The defendant knowingly,

       b.      In and affecting interstate and foreign commerce,

       c.      Recruited, enticed, harbored, transported, provided and obtained by any means a minor; and

       d.      Benefitted financially and received anything of value from participation in a venture engaged in such acts; and

       e.      Knowing or in reckless disregard that the individual had not yet attained the age of 18 years and would be caused to engage in a commercial sex act.

### Count Eight: Narcotics Conspiracy

       a.      At or about the time charged in the Superseding Indictment, the Defendant knowingly, intentionally and willfully agreed with one or more persons to distribute or possess with the intent to distribute, the types and quantities of the drugs set forth in the Superseding Indictment, and

       b.      That the defendant knowingly and intentionally became a member of that conspiracy.

### Count Nine: Distribution of BZP

       a.      On September 9, 2009, the Defendant distributed N-Benzylpiperazine, also known as BZP, a Schedule I controlled substance; and

       b.      That the defendant did so knowingly and intentionally.

### Penalties

       3.      The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows:

       a.      Count One:  a maximum term of 5 years, $250,000 fine, and a maximum term of supervised release of 3 years.

       b.      Count Two:  a maximum term of 10 years, $250,000 fine, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

       c.      Count Three:  a maximum term of 20 years, $250,000 fine, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

       d.      Counts Four and Five:  a maximum term of life imprisonment and a mandatory minimum sentence of fifteen (15) years pursuant to 18 U.S.C. § 1591(b)(1), $250,000, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

       e.      Count Six:  a maximum term of life imprisonment and a mandatory minimum sentence of ten (10) years pursuant to 18 U.S.C. § 1591(b)(2), $250,000, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five

years pursuant to 18 U.S.C. § 3583(k).

        f.      Counts Eight and Nine: a maximum term of 20 years, $1,000,000 fine, a maximum term of supervised release for five years and a mandatory minimum term of supervised release of three years pursuant to 21 U.S.C. § 841(b)(1)(C).

        4.      In addition, the Defendant must pay $800.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court must also order restitution, if restitution is warranted, pursuant to 18 U.S.C. §§ 1593(a), 3663, 3663A, and 3664. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

        5.      The Defendant understands and agrees that as a consequence of his conviction for the crimes to which he is pleading guilty, he will be required to register as a sex offender in the place where he resides, where he is an employee, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence. Failure to do so may subject him to new charges pursuant to 18 U.S.C. § 2250.

<u>Waiver of Rights</u>

        6.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

        a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

        b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

        c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to

present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

      d.    The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

      e.    If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.    By pleading guilty, the Defendant will be giving up all of these rights, including all rights to additional discovery, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      g.    If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

## Advisory Sentencing Guidelines Apply

7.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

8.    This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

      a.    Count One groups with Counts Two and Three (Group One).

      b.    Counts Two and Three: Mann Act and Enticement

       i.       The base offense level is 14.  U.S.S.G. § 2G1.1(a)(2).

       ii.      The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, resulting in an increase of four (4) levels.  U.S.S.G. § 3B1.1(a).

       iii.     The defendant willfully obstructed or attempted to obstruct or impede the administration of justice with respect to the investigation and prosecution of the instant offenses of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, resulting in an increase of two (2) levels. U.S.S.G. § 3C1.1.       iv.      Thus, the adjusted offense level is 20.

    <u>c.</u>     <u>Count Four: Sex Trafficking by Force, Fraud or Coercion (Group Two)</u>

       i.       The offense involved sex trafficking of an individual other than a minor, resulting in a base offense level of 34.  U.S.S.G. § 2G1.1(a)(1).

    <u>d.</u>     <u>Count Five: Sex Trafficking by Force, Fraud or Coercion (Group Three)</u>

       i.       The offense involved sex trafficking of an individual other than a minor, resulting in a base offense level of 34.  U.S.S.G. § 2G1.1(a)(1).

    <u>e.</u>     <u>Count Six: Sex Trafficking of a Minor (Group Four)</u>

       i.       The offense involved the sex trafficking of a minor between the ages of 14 and 18, resulting in a base offense level of 30. U.S.S.G. § 2G1.3(a)(2).

       ii.      The offense involved the use of a computer or an interactive computer service to entice, encourage, offer or solicit a person to engage in prohibited sexual conduct with the minor, resulting in an increase of two (2) levels. U.S.S.G. § 2G1.3(b)(3)(B).

       iii.     The offense involved a commercial sex act resulting in an increase of two (2) levels. U.S.S.G. § 2G1.3(b)(4)(A).

       v.      Thus, the adjusted offense level is 34.

    <u>f.</u>     <u>Count Eight groups with Count Nine</u>

    <u>g.</u>     <u>Count Nine: Distribution of BZP (Group Five)</u>

       i.       N-Benzylpiperazine, also known as BZP, has a stimulant effect on the central nervous system that is substantially similar to the stimulant effect on the central nervous system of 3, 4-methylenedioxymethamphetamine.  U.S.S.G. § 2D1.1, App. Note 5(B)

       ii.      The applicable base offense level is a level 28, to account for at least 200 grams but less than 350 grams of methamphetamine.  U.S.S.G. § 2D1.1(c)(6).

       iii.     The offense also involved the possession of a firearm, resulting in an increase of two (2) levels.  U.S.S.G. § 2D1.1(b)(1)

       iv.      Thus, the adjusted offense level is 30.

e.      There are five groups as determined above.  Chapter Three, Part D, of the Sentencing Guidelines instructs to count as one Unit the Group with the highest offense level which, in this case, is 34 (Group Four).  Group Four counts as 1 unit, as it is the group with the highest offense level.  Groups Two, Three and Five are equally serious or from 1 to 4 levels less serious than Group Four, so the offense level is increased by 3 units.  Group One is more than 9 levels less serious than Group Four, so the offense level is not adjusted as a result.  Thus, the combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that level by 3 units, or 3 levels.  U.S.S.G. § 3D1.4. Accordingly, the combined offense level, before any reduction for acceptance of responsibility, is 38.

f.      This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.  This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

h.      Thus,  the final offense level is 35.

9.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

## Obligations of the United States Attorney's Office

10.     This Office and the Defendant agree that with respect to the calculation of criminal history and the calculation of the advisory guidelines range,  no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, factors under 18 U.S.C. § 3553a. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Forfeiture

11.     The defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include

assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.  Specifically, the court will order the forfeiture of any property used to commit or to facilitate the commission of the offense and all property involved in the offense, including but not limited to the property listed under Forfeiture Allegations in the Superseding Indictment.  The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

## Assisting the Government with Regard to the Forfeiture

12.    The defendant agrees to assist fully in the forfeiture of the foregoing assets.  The defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture.  The defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding or related civil forfeiture case and that he will testify truthfully in any such proceeding.

## Waiver of Further Review of Forfeiture

13.    The defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## Waiver of Appeal

14.    In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.    The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the

decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds an advisory guidelines range resulting from an adjusted offense level of 35; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below the advisory guidelines range resulting from an adjusted base offense level of 35.

        c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

        d.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

        15.      The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement that would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

        16.      The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose

any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

17.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Respectfully,

Rod J. Rosenstein
United States Attorney

By: _____

Solette Magnelli
Assistant United States Attorney

10

I have read this agreement, including the Sealed Supplement, and have carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney.

March 31 2010
_____
Date

_____
Craig Allen Corey, II

I am Craig Allen Corey, II's attorney.  I have carefully reviewed every part of this agreement, including the Sealed Supplement with him.  He advises me that he understands and accepts its terms.  To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

03/31/10
_____
Date

_____
Malik Edwards, Esquire

## ATTACHMENT A

The defendant stipulates and agrees that if this case had proceeded to trial, the government <u>would have proven</u> the following facts beyond a reasonable doubt. The defendant also stipulates and agrees that the following facts <u>do not</u> encompass all of the evidence that would have been presented had this matter proceeded to trial.

From at least January 2009 through September 2009, **CRAIG ALLEN COREY, II**, age 23, did knowingly and willfully conspire with others to distribute and possess with intent to distribute at least 200 grams but less than 350 grams of a quantity of a mixture or substance containing a detectable amount of 3,4-Methylenedioxymethamphetamine (MDMA), also known as Ecstasy, a Schedule I controlled substance, and N-Benzylpiperazine, also known as BZP, a Schedule I controlled substance. **COREY** also knowingly and willfully conspired with Jacob TYLER, and others, from at least January 2009 through April 2009, to transport individuals in interstate commerce with the intent that such individuals engage in prostitution, and to persuade, induce, entice and coerce individuals to travel in interstate commerce to engage in prostitution. Moreover, at some time between January and April 2009, **COREY** did knowingly, in and affecting interstate commerce, recruit, entice, harbor, transport, and provide females referred to herein as "Jane Doe 1," "Jane Doe 2," and "Jane Doe 3," benefitted financially from participation in said acts, knowing that force, fraud and coercion would be used to cause "Jane Doe 1" and "Jane Doe 3" to engage in said acts, and knowing or recklessly disregarding the fact that "Jane Doe 2" was a minor. At all times relevant, Jane Does 1, 2 and 3 were residents of Ohio.

In early 2009, **COREY** maintained an apartment in Millersville, Maryland out of which he operated a house of prostitution. During this time, **COREY** made frequent trips from his Army assignment at Fort Meade, Maryland back to his hometown of Chillicothe, Ohio. From Chillicothe and the surrounding areas, **COREY** began to recruit co-conspirators and females to assist in his Maryland prostitution operation. **COREY** also recruited females from Watertown, New York, where he had previously been stationed at Fort Drum. **COREY** also utilized the internet to recruit females from states such as Virginia.

**COREY** and his co-conspirators advertised these females for sex in the erotic section of the internet classifieds website, Craigslist. **COREY** directed that said postings be paid using pre-paid debit cards, which were typically purchased under an alias and from a local Maryland Wal-Mart and CVS. **COREY** set the pricing that was reflected in these internet ads, as well as the aliases for the females and the language used to entice sex customers to contact the phone numbers in the ads. **COREY** received a portion of all the prostitution earnings, including from Jane Does 1, 2 and 3. These earnings could range in the thousands of dollars per week. **COREY** spent his earnings on items such as electronics, clothes, car accessories and other items symbolizing wealth.

With these prostitution earnings, **COREY** also purchased ecstasy and BZP from a drug dealer in Detroit, Michigan with whom **COREY** became acquainted through another soldier. These, and other drugs, were distributed to numerous individuals, including to females to assist

in motivating them to prostitute for **COREY** and his co-conspirators.

During the relevant time period, **COREY**, TYLER and others transported, and enticed to travel, at least 12 individuals from states such as Ohio, New York and Virginia to Maryland. The females who were brought to Maryland did not have independent forms of transportation or finances, and relied exclusively on the defendants for their well-being.

To further their unlawful activities, **COREY** and his co-conspirators:
a. used Craigslist, MySpace, YouTube, other web-based social networking and classified advertising services, as well as cellular telephones, to recruit females to serve as prostitutes, to promote their prostitution business, and to advertise sexual services;
b. used prepaid debit cards and aliases when posting Craigslist ads for sexual services in order to conceal their unlawful activities;
c. assisted in photographing females in various states of undress to accompany advertisements of sexual services on Craigslist;
d. traveled from destinations within and outside of Maryland, including Ohio ~~and New York~~, to facilitate the prostitution business in Maryland; and
e. collected and shared the cash proceeds of the prostitution business, used a portion of the prostitution proceeds to purchase illegal narcotics, and distributed illegal narcotics to associates, prostitutes, sex and drug customers, and others both inside and outside of Maryland.

At times between January to April 2009, **COREY** and others advertised Jane Does 1, 2 and 3 for commercial sex acts on Craigslist. **COREY** and others photographed Jane Does 1, 2 and 3, both unclothed as well as partially clothed; **COREY** also provided Jane Does 1, 2 and 3 with an aliases.

These photos and aliases were utilized in the Craigslist ads that offered Jane Does 1, 2 and 3 for commercial sex acts. These ads and photographs were posted onto the internet from **COREY's** laptop, located at his Millersville, Maryland apartment, utilizing his personal Craigslist account. This Craigslist account reflected **COREY's** personal email address, an address and phone number belonging to a relative of **COREY's** located in Ohio, and an internet protocol address subscribed to **COREY**. **COREY** provided the account information and use of his laptop to his co-conspirators to post said ads at his direction and in his absence. These ads also featured various pricing level, which **COREY** established. The advertised 202 phone number for sex customers to call and make a date with Jane Does 1, 2 and 3 was subscribed to "Craig Coruy" and had the personal label: "Pimp C."

Two of **COREY's** co-conspirators traveled from Maryland to Ohio, bringing illegal firearms, i.e., one .380 Bersa and one 9 mm Hi Point Luger firearm. **COREY** and the occupants of his apartment knew that the firearms were present; **COREY** and his co-conspirators used the firearms to help facilitate the sex and drug trafficking operations.

Beyond the threat and presence of firearms, threats and actual physical violence were utilized against female sex workers. Two of **COREY's** co-conspirators beat sex workers when disputes over the prostitution business arose. Jane Does 1 and 3 were beaten when they refused

to continue to providing their prostitution earnings to the co-conspirators; **COREY** was aware of these assaults and present in the apartment during some of these occasions. As a result of these physical assaults, Jane Does 1 and 3 continued to prostitute for **COREY** and the co-conspirators' financial benefit.

During the week of April 19, 2009, **COREY** also traveled from Ohio to Maryland with numerous individuals, including Jane Doe 2. Jane Doe 2 was 16 years old at the time, a fact that **COREY** recklessly disregarded. On April 20, 2009, **COREY** and his co-conspirators began advertising Jane Doe 2 on Craigslist for sexual services. At least seven such ads were placed for Jane Doe 2 between April 20 and April 24, 2009. All of these ads were posted on the internet utilizing the Craigslist account belonging to **COREY**, reflecting his personal email address, with said postings being traced to **COREY's** Millersville, Maryland apartment. Subsequently, the photographs posted of Jane Doe 2 accompanying these ads were located on **COREY's** personal laptop computer.

Besides posting ads, **COREY** also maintained the brothel operation out of his Maryland apartment in numerous additional ways. **COREY** drove females who were hired through the internet ads for "out calls," or to visit a sex customer at a destination outside of the Millersville apartment. **COREY** also drove to the Baltimore-Washington International Airport and the Greyhound bus station to pick up female prostitutes who had traveled from both Ohio and New York to work out of **COREY's** Maryland apartment.

During weekdays, while **COREY** was at work, his co-conspirators would enforce and manage the brothel operations. Male co-conspirators would wait in one of the bedrooms of **COREY's** apartment and remain 'hidden' while sex customers were present. **COREY** also instructed the females who answered phone inquiries from the sex ads to inquire whether or not the caller was law enforcement, and that a disclaimer should be included with all posted Craigslist ads, all of which was designed to aid in evading criminal liability. Some females would travel to Maryland from Ohio but would not engage in prostitution. Instead, they would assist the business by posting ads, collecting prostitution proceeds, and maintaining the apartment.

**COREY** would also return from Fort Meade at lunch to collect whatever prostitution earnings had been earned, as he received a percentage of all prostitution proceeds earned. **COREY** also paid for a cellular telephone whose 202 number was primarily dedicated to sex customers calling from the Craigslist ads. When **COREY** took the 202 phone to work and elsewhere, **COREY** would field phone calls from potential sex customers and relay the information back to the occupants of his apartment so the business could continue operating though he was physically absent.

In addition, **COREY** and others distributed numerous illegal narcotics to males and females in Maryland and Ohio, including Marijuana, Xanax, Percoset, Ecstasy and BZP. On at least three different occasions between January and April 2009, **COREY** and others went to Detroit, Michigan to purchase illegal narcotics. **COREY** traveled from Baltimore, Maryland to Detroit, Michigan in **COREY's** Chrysler 300 vehicle. During each trip to Detroit, **COREY**

14

purchased approximately 300 Ecstasy and/or BZP pills of approximately 250 milligrams each. **COREY** consumed and distributed these drugs in Ohio and Maryland.

In approximately July 2009, an undercover detective ("UC") was introduced to **COREY** under the ruse of being a working prostitute. Between July and September 2009, **COREY** stated the following, all of which were recorded: he drove to Detroit, Michigan for Ecstasy; he had Ecstasy in Ohio that he could transport, or that he could have a co-conspirator transport, to Maryland to sell to the UC; and that, when he drove narcotics into Maryland, he would hide them in a compartment behind the CD player in his Chrysler 300.

Ultimately, law enforcement officers wired **COREY** $600 to facilitate a purchase of ecstasy. On September 9, 2009, the UC drove to a location just outside Fort Meade and waited for **COREY** to retrieve narcotics from his housing on Fort Meade, at which he lived subsequent to moving out of his Millersville apartment. **COREY** provided the UC with 50 pills, which lab analysis later confirmed was N-Benzylpiperazine, also known as BZP, which has a stimulant effect on the central nervous system that is substantially similar to the stimulant effect on the central nervous system of 3, 4-methylenedioxymethamphetamine. Analysis also confirmed that the 50 pills weighed 33.8 grams.

During the recorded meetings and~~/~~ conversations [could have] leading to the BZP purchase, **COREY** also acknowledged that he used to pimp females but had stopped because the police were watching him closely. **COREY** told the UC that he ~~had~~ earned approximately $150,000 per year when combining "everything" together. At the time, **COREY's** military pay was approximately $ 2,000 every month. **COREY** further stated that females from New York had been contacting him to return to Maryland and "work" for him again. **COREY** acknowledged that advertising Jane Doe 1 and other females had generated substantial proceeds for both he and his co-conspirators. **COREY** also stated that he had propositioned a female online and enticed her to "work" for him in Maryland, promising that she would earn substantial proceeds. Finally, **COREY** acknowledged to the UC that he had provided ecstasy to prostitutes, including a female from New York.

Since his September arrest, the following phone conversations were recorded during **COREY's** detention.

On October 8, 2009, **COREY** directed his fiancé to make contact with Jane Doe 2, record said phone call, and encourage Jane Doe 2 to tell law enforcement that he did not transport her from Ohio to Maryland. **COREY** also directed his fiancé to contact a cooperating witness, who was present during Jane Doe 2's trip from Ohio to Maryland, and encourage this witness to change his story when meeting with federal investigators. Finally, **COREY** directed his fiancé to contact other witnesses and have them write statements supporting **COREY's** version of events to federal investigators. On October 15, 2009, **COREY** admitted that each pill of ecstasy he had sold was 250 milligrams. On November 23, 2009, **COREY** again asked his fiancé to contact Jane Doe 2, this time via MySpace, in order to encourage Jane Doe 2 to state that she was 18 years old when she was in Maryland. **COREY** also asked his fiancé to find an additional witness, but his fiancé replied that she had been unable to locate this person. On December 9, 2009, **COREY** discussed his commercial sex business, referring to the prostitutes as "the girls" and stated that, "Yes, I did get a

percentage of their money." **COREY** also stated that he was present when Jane Doe 2 was transported from Ohio to Maryland.

March 31 2010
_____
Date

_____
Craig Corey

03/31/10
_____
Date

_____
Malik Edwards, Esquire

16